CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

JAN 1 2 2009

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DENNIS J. DORMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) Civil Action No. 7:08cv00023 | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) By: Michael F. Urbanski | |
| Commissioner of Social Security, ) United States Magistrate Judge | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Dennis J. Dorman ("Dorman") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). On appeal, Dorman contends that the Administrative Law Judge ("ALJ") erred by failing to give proper weight to the opinion of Dorman's treating physician, Dr. Kim, and by finding Dorman's testimony not entirely credible. Having reviewed the record, the undersigned finds the ALJ's decision is supported by substantial evidence. As such, the Commissioner's decision is affirmed and Defendant's Motion for Summary Judgment is granted.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id.

1

(alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working;

(2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Dorman was born in 1963, (Administrative Record, hereinafter "R." 21, 56, 60, 67), and at the time of the ALJ's decision was considered a "younger individual" under the Act. 20 C.F.R. § 404.1563(b). He has a high school diploma and one year of college. (R. 21, 77, 635.) Prior to the alleged onset date, Dorman worked in a restaurant, as a self-

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. § 404.1529(a).

employed handyman, and as the owner of a kitchen and bath remodeling business. (R. 72, 119, 143, 639-40, 666-67.)

Dorman alleges a disability onset date of November 5, 2002, due to triple back fusion and unknown heart failure. (R. 71.) His date last insured is September 30, 2005.[2] (R. 16.) Pursuant to the regulations, Dorman must prove he became disabled on or before his date last insured in order to establish a DIB claim. 20 C.F.R. § 404.141. His application for benefits was rejected by the Commissioner initially and again upon reconsideration. An administrative hearing was convened before an ALJ on May 16, 2006. (R. 628-74.) In determining whether Dorman was disabled under the Act, the ALJ found that his chronic low back pain with right L5 radiculopathy and status post two (2) lumbar surgeries, cervical spondylosis, and a history of heart problems, all qualify as severe impairments, pursuant to 20 C.F.R. § 404.1520(c). (R. 16.) Despite the fact that Dorman testified he worked as a handyman and restaurant manager after his alleged onset date, the ALJ determined that Dorman had not engaged in substantial, gainful employment during the relevant period. (R. 16.) The ALJ further found that Dorman has the RFC to perform a limited range of sedentary work. (R. 19.) Specifically, the ALJ held Dorman could lift or carry 10 pounds occasionally, sit for a total of 6 hours in an 8 hour day, and stand or walk for 2 hours total in an 8 hour day, with occasional stooping, kneeling, crouching, crawling and climbing. (R. 19.) The ALJ noted that Dorman should avoid hazards such as machinery and climbing ladders, ropes or scaffolds, but had no other environmental, manipulative, visual or communicative limitations. (R. 19.) Finding there are a significant number of jobs in the national economy that he can

---

[2] The ALJ cites Dorman's date last insured as September 30, 2005. (R. 16.) The undersigned notes, however, that the date last insured listed on the Disability Report is September 30, 2004. (R. 67, 144.)

4

perform, the ALJ held that Dorman is not disabled under the Act. (R. 21-22.) The Appeals Council denied Dorman's request for review and this appeal followed. (R. 7-9.)

### III

Dorman argues that the ALJ erred by failing to give proper weight to the opinion of his treating physician, Dr. Kim. The ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. § 404.1527(d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations...."); Social Security Ruling ("SSR") 96-2p.

On May 3, 2006, Dr. Kim filled out a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." (R. 610-13.) Dr. Kim stated Dorman could occasionally lift and/or carry less than 10 pounds; stand and/or walk 2 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; perform limited pushing and/or pulling in

both the upper and lower extremities; never climb, crouch or crawl; and occasionally balance, kneel, stoop and perform overhead reaching. (R. 610-11.) Dr. Kim further found that Dorman should be subject to limited temperature extremes, vibration, humidity/wetness, and hazards. (R. 612.) He indicated that Dorman's impairments would cause him to be absent from work once per month, and noted that the condition has existed and persisted with these restrictions since November 5, 2002. (R. 613.) At the administrative hearing, the vocational expert ("VE") testified that the limitations put in place by Dr. Kim would "very severely erode" the occupational base of unskilled sedentary jobs he testified Dorman could perform; however, it would not abolish the occupational base entirely. (R. 672-73.)

The ALJ adequately addressed Dr. Kim's opinion (R. 18, 20-21), and substantial evidence supports the weight he attributed to it. Dorman began treating with Dr. Kim for pain management after he was discharged from Dr. Samarasinghe's care because he violated his narcotics contract by "receiving controlled substances from multiple physicians and filling them at multiple pharmacies." (R. 604.) His first visit to Dr. Kim was on March 13, 2006, over six months after his date last insured, September 30, 2005. (R. 622-24.) Dr. Kim did not treat Dorman during the preceding four years; nevertheless, he opined that the condition causing Dorman's limitations had existed and persisted since Dorman's alleged onset of disability on November 5, 2002. (R. 613.)

Dr. Kim's opinion as to Dorman's functional capacity is unsupported by his own notes and records. Dr. Kim's records indicate that x-rays showed excellent healing of the anterior construct L5-S1 post-surgery. (R. 622.) He stated Dorman was not in distress (R. 623), and found that Dorman had subtle weakness in the right hip abductor but noted

6

his ambulation was functional. (R. 624.) Examination revealed minimal muscle spasm along the right lumbar paraspinal muscles (R. 623), moderate local tenderness over the right sacroiliac joint (R. 623), normal muscle tone (R. 623-24), good speed of motion (R. 624), a stable gait on level surface (R. 623), and that Dorman is able to come to standing from a sitting position without difficulty. (R. 623.) Dorman had no trouble walking during his initial appointment, but records indicate he exhibited difficulty walking on his toes during his second visit, and then difficulty walking on his heels during his third visit. (R. 625, 626.) Dr. Kim stated that Dorman was feeling better in the warm weather, had no pain or severe numbness in his lower extremities, his complaints of pain in the lumbosacral area had decreased, and he was able to maintain his activities. (R. 626.) Indeed, Dr. Kim's records reveal Dorman was working five days per week. (R. 625, 626.) Dr. Kim prescribed narcotic pain medications, including a fentanyl patch and oxycodone (R. 624, 626) and noted that Dorman's pain was manageable with his current medications. (R. 626.) Dr. Kim also questioned Dorman's exaggeration of symptoms, noting he had "[s]ome functional overlay." (R. 625.) This medical evidence does not support the degree of limitation indicated by Dr. Kim in his functional capacity assessment.

Moreover, the evidence of record contradicts Dr. Kim's findings as to Dorman's physical limitations from November 5, 2002 through September 30, 2005. Though the record documents Dorman's history of back surgery and persistent complaints of pain, notes state that Dorman remained active during the relevant period (R. 244, 315, 317, 371), and "continued to try to function at a high level." (R. 304.) Medical records reveal he was able to care for his children (R. 295, 304, 312, 316, 334, 341), care for his mother

(R. 295, 304, 309), perform his household duties and care for his home. (R. 341.) Moreover, notes consistently indicate that he was working from 2002 to 2005. (R. 244, 297, 301, 311, 316, 320, 325, 331, 336, 338, 341, 353, 371, 374, 376, 598.) Indeed, Dorman reported to his physicians that he was working in his cabinetry business. (R. 316, 331, 336, 338, 353.) Notes reveal he was very busy with his contractor employment (R. 320), and that he was remodeling kitchens well into 2005.[3] (R. 376.) On February 24, 2003, Dorman reported to Dr. Leipzig that he was working sixteen hours per day. (R. 244.) Dr. Perry's notes indicate that in April, 2004, Dorman continued to work increasing hours (R. 325), and in March, 2005, he increased his responsibilities at his primary employment. (R. 301.) Notes reveal that at various points in time during the relevant period, Dorman dug a trench at his house (R. 244), fell off of a ladder (R. 601), and dropped a hammer on his ankle. (R. 353.) He also worked as a manager for a restaurant. (R. 297, 311, 598.) Dorman was consistently encouraged to continue his activities of daily living (R. 296, 298, 301, 303, 305, 312, 317, 327, 329, 330, 331, 337, 344, 372, 377, 380) and his employment (R. 296, 298, 312, 317, 331, 337, 339, 372, 375, 377, 380), and to continue to care for his family (R. 298, 317, 327, 329, 372, 375, 377) and participate in activities outside the home (R. 329). Dorman continued to work and perform his daily activities after his date last insured. (See, e.g., R. 363-64, 365, 576-87, 607, 609, 625, 626.)

Dorman's work activities and activities of daily living contradict Dr. Kim's assessment of his physical limitations. Likewise, following a review of the records, a state agency physician noted on March 16, 2004 that Dorman could occasionally lift or

---

[3] It is worth noting that at the administrative hearing, Dorman testified that his kitchen and bathroom remodeling business involved "a lot of heavy lifting." (R. 639.)

8

carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, with unlimited pushing and pulling, and occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 216-23.) On March 23, 2005, Dr. Surrusco agreed with this RFC assessment, but found that Dorman was limited in pushing and pulling in his lower extremities. (R. 273-79.) Dr. Johnson affirmed this assessment on May 25, 2005. (R. 279.)

Though the record documents both a history of back problems and Dorman's consistent complaints of pain, there is simply nothing in the medical evidence that supports the degree of limitation set forth by Dr. Kim in the residual functional capacity assessment. Dorman's activity level as reported to his physicians plainly contradicts these alleged restrictions. Moreover, Dr. Kim did not even begin treating Dorman until six months after his date last insured. The undersigned finds substantial evidence supports the weight given to Dr. Kim's opinion by the ALJ.

IV

Dorman further argues on appeal that the ALJ erred by finding his testimony concerning his pain and limitations not entirely credible. Dorman testified at the administrative hearing that he can sit for a couple of hours a day, as long as he can get up to move around for five to fifteen minutes. (R. 642-43.) He testified he can stand in one spot for two to three minutes before his back starts aggravating him and he has to change positions. (R. 643.) The ALJ noted at the hearing that he found this limitation hard to believe, considering Dorman's testimony as to the handyman work he was able to perform. (R. 644.) Standing up to demonstrate, Dorman stated he felt better if he is able

9

to move around back and forth instead of standing in one spot. (R. 643-45.) Dorman then admitted he may have exaggerated:

> Q. Okay, so you can't even stand at a sink and brush your teeth more than two minutes?
>
> A. No. Maybe I made an exaggeration on the two or three minutes ...

(R. 646.) He further testified he could walk five or ten minutes before needing to take a rest for fifteen or thirty seconds. (R. 646-47.) Dorman stated that he can lift a gallon of milk and sometimes more. (R. 647.) He said he lies down on average two to three times per day for twenty minutes to an hour. (R. 649-51.) As to how Dorman is able to perform his job as a handyman with this limitation, Dorman testified:

> Q. The owner [of the house he is fixing] just lets you just pile up on their couch and lay down for 20 or 30 minutes?
>
> A. If I needed to, yes; but most of the time, I'll go outside, and I'll sit in my car, and, and –
>
> Q. Well, that's not laying down; that's sitting. Ms., Ms. Hansen asked you about laying down.
>
> A. Well, normally, I'll lay down when more at home. . . .

(R. 650.)

Despite these alleged limitations, Dorman testified that he works as a handyman on one or two jobs per month, performing tasks such as fixing leaky pipes, hanging pictures, cleaning, changing a supply line under a bathroom sink, putting up plastic shower enclosures around a bathtub, and changing a spigot or showerhead. (R. 635-39.) These tasks often take him three to five days to complete. (R. 636-37.) He also operated and managed his sister's restaurant. (R. 638, 664.) He is able to do some grocery

shopping (R. 113, 655), puts dishes in the dishwasher and laundry in the laundry machine (R. 112, 655), takes care of the pets (R. 111), and acts as a "stay-home dad" for his daughters. (R. 111, 655.) He also testified that he does a majority of the cooking and running errands during the day, shuttles his daughters back and forth to school, helps keep the family finances, builds model cars and collects coins, goes to church, goes to the movies once per month, goes out to dinner two to three times per week, takes a beach vacation twice per year, goes to the Salem fair, and attends his daughter's home basketball games. (R. 655-60.) Dorman testified that he has a driver's license but has difficulty driving distances longer than forty-five minutes to an hour. (R. 651.) However, he drove to the beach for vacation and stated he had to pull over every 35 to 45 minutes. (R. 652-54.)

When faced with conflicting evidence contained in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and his ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007). Accordingly, the ALJ is not required to accept Dorman's testimony that he is disabled by pain and must lie down several times during the day, and instead must determine through an examination of the objective medical record whether Dorman has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers."). A claimant's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. §

404.1528(a). "[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591 (citing Mickles v. Shalala, 29 F.3d 918, 922 (4th Cir. 1994)); see also 20 C.F.R. § 404.1529(b). Subjective evidence cannot take precedence over objective medical evidence or the lack thereof. Craig, 76 F.3d at 592 (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). The ALJ must determine whether Dorman's testimony about his symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; SSR 95-5p.

Dorman argues that the ALJ erred by finding his statements concerning the intensity, persistence and limiting effects of his symptoms to be not entirely credible. (See R. 20.) Dorman specifically points to the fact that the ALJ erroneously noted in his opinion that Dorman was able to drive to Florida for a family vacation, when in fact he traveled to North Carolina, a significantly shorter driving distance from Virginia. (Pl.'s Br. 22.) This distinction is of no moment. Both North Carolina and Florida are outside of the forty-five minute time period Dorman testified he could drive without difficulty. (R. 652-54.) Likewise, Dorman's argument that the ALJ mischaracterized Dorman's testimony concerning how long he can stand at one time falls short. There are numerous notes in the record that would give the ALJ pause as to Dorman's credibility.

For instance, there is a suggestion in the medical evidence that Dorman was exaggerating his symptoms in order to receive more narcotics. In a letter discharging

12
Case 7:08-cv-00023-mfu Document 20 Filed 01/12/09 Page 12 of 14 Pageid#: 85

Dorman as a patient, Dr. Samarasinghe of Comprehensive Pain Management Centers stated:

> It has come to our attention that you have been receiving controlled substances from multiple physicians and filling them at multiple pharmacies, since you have been seen in our clinic. . . . On 12/27/05, you received 120 of oxycodone 30 mg from our clinic as well as Duragesic patch. On 01/02/06, you filled 120 of oxycodone 30 mg from Dr. John Sadler. You have used multiple pharmacies including Brambleton Drug, Valley Apothecary, Sanco, and in the past have also used Walgreens. The above factors have violated the patient responsibility agreement that you signed with our clinic on 12/27/05. Because you have violated your agreement, you are discharged from this clinic.

(R. 604.) When Dorman began treating with Dr. Kim in March, 2006, nothing in the record indicates that he informed Dr. Kim that he had been discharged from Dr. Samarasinghe's care due to violations of his narcotics contract. Rather, Dr. Kim's notes indicate Dorman reported having been treated by Dr. Perry for pain until January, 2006, and that he was cutting down on medications because he was running out of them. (R. 622-24.) Further eroding Dorman's credibility is Dr. Kim's note that Dorman had some functional overlay, or exaggeration of symptoms. (R. 625.)

Moreover, the record evidence does not support Dorman's statements as to his physical limitations. As discussed in detail above, office notes from Dorman's physicians indicate that Dorman maintained a very active lifestyle, working and taking care of his family, perhaps to a greater degree than he testified to at the administrative hearing. See discussion, supra, § III. Based on the notes contained in the record and Dorman's own testimony as to his activities at work and at home, the court finds no reason to disturb the ALJ's credibility assessment. See Shively v. Heckler, 739 F.2d 987,

13
Case 7:08-cv-00023-mfu  Document 20  Filed 01/12/09  Page 13 of 14  Pageid#: 86

989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Allegations of pain and other subjective symptoms, without more, are insufficient to establish disability. Craig, 76 F.3d at 592. Thus, the undersigned recommends that the ALJ's decision be affirmed.

V

At the end of the day, it is not the province of the reviewing court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence and, in this case, substantial evidence supports the ALJ's opinion. In affirming the final decision of the Commissioner, the court does not suggest that Dorman is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Dorman's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the Commissioner's decision is affirmed and Defendant's motion for summary judgment is granted.

The Clerk of Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTER: This 12th day of January, 2009.

_____
Michael F. Urbanski
United States Magistrate Judge